UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) ) | Case No. 17bk03367 |
| Jewel Carter, | ) ) | Chapter 13 |
| Debtor. | ) ) ) | Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

<u>MEMORANDUM DECISION</u>

The matter before the court comes on for consideration on two motions:

1.      The Motion to Dismiss Case for Failure to Make Plan Payments [Dkt. No. 38] (the "<u>Motion to Dismiss</u>") brought by the chapter 13 trustee, Marilyn O. Marshall (the "<u>Trustee</u>"); and

2.      The Motion to Modify Plan [Dkt. No. 48] (the "<u>Motion to Modify</u>") brought by the above-captioned debtor Jewel Carter (the "<u>Debtor</u>").

The Motion to Modify and the Debtor's opposition to the Motion to Dismiss address the understandable confusion that arises when a chapter 13 trustee neglects over an extended period to act in a way consistent with a debtor's plan obligations.  While the Debtor's contention that the Trustee should be estopped from enforcing plan conditions that the Trustee has neglected garners some sympathy from the court, it ignores the fact that the Debtor too has neglected those same conditions and does not change that, even absent the Trustee's Motion to Dismiss, the Debtor's Plan, Model Plan [Dkt. No. 22] (the "<u>Plan</u>"), is in default.  Still, the Debtor is in an unfortunate position with a plan that cannot be modified or extended and obligations that cannot be met within the time of the plan.  The Debtor is elderly and on a fixed retirement income.  These circumstances are not entirely of the Debtor's own making.

Though it is unlikely Congress anticipated these exact circumstances, this is the type of conundrum that both Congress and the United States Supreme Court have empowered the court to resolve.  As a result, the court exercises that authority to determine that the Debtor has fulfilled all the conditions of his Plan that he might reasonably be required to perform under the circumstances and that any further enforcement of the confirmation order to the contrary is no longer equitable.

The Plan is therefore complete and, as a result, the Motion to Dismiss will be DENIED and the Motion to Modify will be GRANTED, insofar as it is necessary to effectuate that relief.

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>").  28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings

arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred has statutory authority to enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1) & (c). Absent consent, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall,* 564 U.S. 462 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.,* or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The dismissal of a bankruptcy case is a matter concerning the administration of the estate and is thus a core proceeding under the Bankruptcy Code. 28 U.S.C. § 157(b)(2)(A); *In re Class A Properties Five, LLC*, 600 B.R. 27, 30 (Bankr. N.D. Ill. 2019) (Barnes, J.). A motion to dismiss under section 1307 of the Bankruptcy Code "stems from the bankruptcy itself," and thus may constitutionally be decided by the bankruptcy court. *Stern*, 564 U.S. at 499.

By the same token, a motion to modify a confirmed chapter 13 plan also concerns both the administration of the of the estate and the propriety and enforceability of the court's prior orders. 28 U.S.C. § 157(b)(2)(A); *Class A Properties Five*, 600 B.R. at 30; *see also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."); *In re Kimball Hill, Inc.*, 565 B.R. 878, 890 (Bankr. N.D. Ill. 2017) (Barnes, J.) (same), *vacated in part on other grounds by Fid. & Deposit Co. of Maryland v. TRG Venture Two, LLC*, Case No. 19 C 389, 2019 WL 5208853 (N.D. Ill. Oct. 16, 2019). Such a motion is expressly a core proceeding and thus is statutorily within the court's jurisdiction and constitutionally soundly within the bankruptcy court's authority. *Stern*, 564 U.S. at 499.

It follows that the court has the jurisdiction, statutory authority and constitutional authority to hear and determine the Motion to Dismiss and the Motion to Modify.

2

PROCEDURAL POSTURE

The matter before the court arises first out of the Motion to Dismiss. The Motion to Dismiss was first heard by the court on October 21, 2021, and continued one-week for the parties to investigate the cause of the default. At the October 28, 2021, hearing, the court ordered briefing from the parties. Order [Dkt. No. 41]. In accordance with that Order, on November 2, 2021, the Debtor filed his Response to Marilyn O. Marshall's Motion to Dismiss for Failure to Make Plan Payments [Dkt. No. 42] (the "Response"). Thereafter, also in accordance with the Order, the Trustee filed her Reply to Debtor's Response to Trustee's Motion to Dismiss [Dkt. No. 43] (the "Reply") on November 17, 2021.

After the briefing was complete, the parties returned to the court on December 9, 2021. At that hearing, the court identified potential deficiencies with the Response, some of which will be discussed in further detail below.

As a result of those observed deficiencies, the Debtor attempted to address his fundamental issues with the Motion to Dismiss with the Motion to Modify. At the hearing on both the Motion to Dismiss and the Motion to Modify on January 13, 2022, the parties agreed that the briefing on the Motion to Dismiss was sufficient to brace the issues and that no further briefing on the Motion to Modify was necessary. The court continued the matter for one final hearing on February 3, 2022, with the intent that the parties try to reach some amicable solution to resolve the missteps made by both parties. No solution was reached and thus, on February 3, 2022, the court took the matter under advisement.

This Memorandum Decision constitutes the court's ruling on all of the matters so taken under advisement. It also results in the denial of a new Motion to Dismiss for Failure to Make Plan Payments [Dkt. No. 51] filed by the Trustee on March 2, 2022 (the "New Motion to Dismiss"). The court believes that that the New Motion to Dismiss was mistakenly filed by the Trustee, as it is both no different from the Motion to Dismiss and filed in violation of the court's clear rule on further filings regarding a matter taken under advisement without leave of the court. *See, e.g.*, *In re Aguirre*, 548 B.R. 525, 532 (Bankr. N.D. Ill. 2016) (Barnes, J.), *vacated on other grounds,* 565 B.R. 646 (N.D. Ill. 2017).

Though these items do not constitute an exhaustive list of the filings in the above-captioned bankruptcy case, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same).

BACKGROUND

As noted above, the facts of this matter are unfortunate, as is the position the Debtor is now in.

The Debtor filed for bankruptcy on February 6, 2017. Petition [Dkt. No. 1]. At that time, the Debtor was married in a household of four, with an under the median annual income totaling $18,691.92. Official Form 122C-1 [Dkt. No. 5]. Given the amount of income, the Debtor was

3

required only to submit to a 36-month plan, the so-called "applicable commitment period." 11
U.S.C. § 1325(b)(4).

While the Debtor's originally proposed plan failed to address correctly the Debtor's
mortgage commitments, on March 28, 2017, the Debtor proposed the Plan, a modified chapter 13
plan that did correctly address the mortgage. The Debtor's Plan called for the Debtor to make 36
monthly payments to the Trustee for the Trustee to administer. *Id.* at § D(1). Those payments were
in the amount of $175.00/month. *Id.*

Because the Plan proposed to pay the Debtor's general unsecured creditors only 10% of
their claims, *id.* at § H(4)(b), the Trustee requested and the Debtor agreed to the following "Tax
Turnover" commitment:

> On or before April 20th of the year following the filing of the case and each
> year thereafter, the Debtor(s) shall submit a copy of the prior year's filed federal tax
> return to the Chapter 13 Trustee. The Debtor(s) shall further tender the full amount
> of each year's tax refund received while the case is pending to the Chapter 13
> Trustee. The tax refunds shall be treated as additional payments into the plan and
> must be submitted within 7 (seven) days of receipt of each such refunds by the
> Debtor(s).

Order Confirming Plan [Dkt. No. 24] (the "Confirmation Order"). The Plan was confirmed on
March 30, 2017. *Id.*

Per the express terms of the Tax Turnover commitment, the propriety of which the court
will discuss below, the Debtor was required to turn over to the Trustee a copy of the Debtor's 2017
tax return and all of his tax refund for 2017 on or before April 20, 2018. The Debtor failed to do
either and on August 21, 2018, the Trustee moved to dismiss the Debtor's above-captioned case for
a material default of the Plan. Motion to Dismiss for Material Default [Dkt. No. 34] (the "First
Motion to Dismiss").

Prior to the hearing on the First Motion to Dismiss, the Debtor turned over to the Trustee
his 2017 joint tax return, which indicated that the Debtor had received a refund of $7,259.00. The
Debtor alleges that the entirety of the tax refund was tax credits (the earned income and child tax
credits). Resp., at p. 2; Mtn. to Modify, at ¶ 5. Thereafter, without receiving the refund and prior to
the initial hearing, the Trustee withdrew the First Motion to Dismiss. Dkt. No. 35.

The following year, the Debtor again failed to satisfy the Tax Turnover commitment, failing
to turn over to the Trustee by April 20, 2019, a copy of the Debtor's 2018 tax return and his 2018
tax refund. On June 21, 2019, the Trustee therefore moved to dismiss the Debtor's above-
captioned case for a material default of the Plan. Motion to Dismiss for Material Default [Dkt.
No. 36] (the "Second Motion to Dismiss").

While the First Motion to Dismiss cited a failure to tender tax refunds as cause for dismissal,
the Second Motion to Dismiss made no mention of the missing tax refund from 2018, only the
missing tax return. As with the First Motion to Dismiss, prior to hearing on the Second Motion to
Dismiss, the Debtor turned over to the Trustee his 2018 joint tax return, which indicated that the
Debtor had received a refund of $9,034.00. The Debtor alleges that the entirety of the tax refund

4

was tax credits (the earned income and child tax credits).  Resp., at p. 2; Mtn. to Modify, at ¶ 6.  Thereafter, without receiving the refund and prior to the initial hearing, the Trustee withdrew the Second Motion to Dismiss.  Dkt. No. 37.

In 2020, the Debtor's counsel mailed the Debtor's 2019 joint tax return to the Trustee in advance of the April 20th deadline in the Tax Turnover commitment.  That return indicated a refund of $9,232.00, of which $8,271.00 resulted from tax credits.  Resp., at p. 3; Mtn. to Modify, at ¶ 7.  Though the Debtor did not pay the refund to the Trustee, the Trustee filed no motion to dismiss.

In 2021, the Debtor's counsel mailed the Debtor's 2020 joint tax return to the Trustee in advance of the April 20th deadline in the Tax Turnover commitment.  That return indicated a refund of $5,604.00, of which $5,142.00 resulted from tax credits.  Resp., at p. 3; Mtn. to Modify, at ¶ 7.  Once again, though the Debtor did not pay the refund to the Trustee, the Trustee filed no motion to dismiss.

Fast forwarding to later in 2021, the Trustee again brings a motion to dismiss, the Motion to Dismiss at bar.  Per the Motion to Dismiss itself, it was filed in the 56th month of the Plan.  It alleges a payment default of $15,800.58, nearly 50% in excess of the total plan payments made by the Debtor to that point, $10,810.89 (the "Total Payments").  It also alleges a total amount due under the Plan of $40,754.00 (the "Total Due").

The Motion to Dismiss also shows that the Debtor, at least in the 12 months preceding the filing of the Motion, made regular monthly payments—occasionally missing a month then correcting it with a double payment the following month.  The payment history that was provided in the Motion to Dismiss shows a debtor who was fairly consistently meeting his plan payments as they came due.

All things being equal, assuming 36 months of payments at $175.00/month, the Debtor would have completed his plan payments after paying in a total of $6,300.00.  But all things were not equal under the Debtor's Plan.

First, the Debtor committed to a dividend of not less than 10% to the Debtor's general unsecured creditors.  To make those payments, the Debtor voluntarily committed his otherwise exempt social security income to the Plan.[1]  The Debtor had only two claims filed in his chapter 13 case, one for $144,733.67 filed by his mortgage lender, Lakeview Loan Servicing, LLC (the "Mortgage Claim") and one filed by the City of Chicago Department of Finance in the amount of $16,678.40 (the "Parking Tickets").  The Mortgage Claim was filed as secured, so would not

---

[1]      As the District Court has stated:

> Even if it is not clear enough from the language of 42 U.S.C. § 407 alone that Congress intended to exclude social security benefits from consideration in bankruptcy proceedings, it is clear from the provisions of Chapter 13, in which Congress went to great lengths to prescribe a method of calculating income that explicitly excludes social security benefits, that *Congress intended social security benefits to be beyond the reach of creditors who object to a proposed Chapter 13 repayment plan in order to boost their recovery.*

*In re Manzo*, 577 B.R. 759, 768 (N.D. Ill. 2017) (footnote omitted) (emphasis added).

normally factor into the length of the Plan or the amount due.  The Parking Tickets were not filed as secured and thus do factor in.  Ten percent of the Parking Tickets claim would require a payment of $1,667.84.  This isn't alone enough to drive the plan beyond 36 months ($1,667.84 is less than $6,300.00), which brings us to the second unequal factor.

Second, then, is that the Mortgage Claim contained arrears in the amount of $4,620.96 to be paid under section E of the Plan.  Plan, at § E(5)(a).  That could have been handled within 36 months as well, as $1,667.84 plus $4,620.96 is $6,288.80.  But that brings us to the third unequal factor.

Third, also in section E of the Plan, were the Debtor's counsel's fees of $4,000.00, Plan at § E(4), which were approved by the court at confirmation.  Order Granting Application for Compensation [Dkt. No. 25].  Handling those fees, which must be paid by the Trustee prior to payments to general unsecured creditors, 11 U.S.C. § 1326(b)(1); 11 U.S.C. § 507(a)(2), adds to the Debtor's minimum financial commitment under the Plan.  Together with the preceding $6,288.80, that brings the Debtor's minimum financial commitment under the Plan to $10,288.80 ($10,673.06 if we include the $384.26 in expenses of counsel also approved by the court) for the Debtor to meet the required 10% commitment to unsecured creditors.

That $10,673.06 was almost precisely what the Debtor paid into the Plan, though for a period exceeding 36 months.  As noted above, he paid in the Total Payments of $10,810.89.[2]  When the Debtor made his final, lump sum payment on June 30, 2021, he did so believing that he was done with his Plan commitments.  Resp., at p. 3; Mtn. to Modify, at ¶ 8.

So where does the dispute arise?  It is mainly from Tax Turnover commitment.

The Tax Turnover commitment requires some explanation.  The logic behind it is this:  A debtor is required to devote his or her entire projected disposable income to the Plan for the applicable commitment period of the Plan, "less amounts reasonably necessary to be expended." 11 U.S.C. § 1325(b)(2).  Disposable income is projected out of current monthly income ("CMI"), id., which includes income "without regard to whether such income is taxable income."  11 U.S.C. § 101(10A).  In other terms, CMI begins with gross income from all sources, unless expressly exempted therefrom.  From that gross income, a debtor may deduct amounts reasonably necessary to be expended.  11 U.S.C. §§ 1325(b)(2) & (3).  Those amounts are as set forth on Schedule I.

There are at least two instances where tax refunds might skew this calculation.

First, a debtor's withholding may be inaccurate, and thus result in a higher or lower deduction from CMI of the tax withholding expense.  In this instance, while the income that generated an over-withholding is included in CMI, a larger than necessary expense is deducted from CMI and thus projected disposable income is too low.[3]  The Seventh Circuit has suggested that this

---

[2]     The difference may be attributable to the Trustee's administration fees, which the Plan estimated to be nearly $300.00.  Plan, at § E(1).

[3]         A plan that accurately reflects anticipated tax liability on Schedule I as an expense need not provide for payment to the trustee of tax refunds based on over-withholding, because no such refunds are expected.  If the debtor is over-withholding and instead reports on Schedule I actual tax withholding, which is known or virtually certain to result in a tax

inaccuracy might still not result in the need to pay tax refunds into the plan, *Marshall v. Blake*, 885 F.3d 1065, 1075 n.10 (7th Cir. 2018), but did not fully explain how that is the case. One explanation might simply be that the court's determination at confirmation of projected disposable income is binding, regardless of whether later developments make the estimates ruled reasonable at the time to be incorrect in hindsight.

The second is where the tax refunds include tax credits, which under the broad definition of CMI in the Bankruptcy Code, are supposed to be included in income. *Blake*, 885 F.3d at 1075 ("[T]ax credits must be included in CMI when calculating disposable income."). Thus tax credits such as are applicable here, the earned income credit and the child welfare credit, are nonetheless subject to inclusion in the calculation. *In re Royal*, 397 B.R. 88, 94 (Bankr. N.D. Ill. 2008) (Hollis, J.) (finding earned income credit to be included in CMI); *In re Morales*, 563 B.R. 867, 871 (Bankr. N.D. Ill. 2017) (Doyle, J.) (finding earned income credit, child tax credit and educational credit to "satisfy the test for 'projected' disposable income and must be included in the calculation of the debtor's plan payment.").

The tension regarding these two potential circumstances has resulted in a practice in the Northern District of Illinois of trustees requested that debtors commit a portion of their tax refunds to their plans. *Morales*, 563 B.R. at 869 (Debtors "may agree to turn over tax refunds as a shortcut to eliminate the need to determine a reasonable tax expense to deduct from CMI.").[4] This speeds along confirmation hearings as it overcomes hesitation from the Trustee with respect to tax withholdings.[5]

It has also resulted in a fair degree of litigation between the Trustee and debtors. *See, e.g.*, *Blake*, 885 F.3d at 1075; *In re Gibson*, 564 B.R. 608, 613 (Bankr. N.D. Ill. 2017) (Doyle, J.) (noting that the effect of the Trustee's approach to taxes, "whether intended or not, is that debtors with the

---

refund, and then deducts that actual over-withholding in calculating reasonably necessary expenses, the debtor will need to provide for payment of the tax refund into the plan, because the debtor's income has been artificially reduced by over-withholding.

*In re Orozco*, 613 B.R. 23, 31 (Bankr. D. Or. 2020).

[4]    At the time of confirmation of the Plan in this case, the Trustee was demanding all of those refunds while other trustees in this District were requesting less. This practice has since normalized into a commitment, regardless of the trustee assigned, of all eligible refunds over $1,200.00.

[5]    The court makes several references to "confirmation hesitancy" in this Memorandum Decision. The choice of words underlying this phrase is deliberate. Trustees are required to appear and be heard at any hearing that concerns the confirmation of a debtor's chapter 13 plan. 11 U.S.C. § 1302(b)(2)(B). Objections to plans, however, must be in writing, filed and served. Fed. R. Bankr. P. 3015(f). Rather than force trustees to object to the many problematic chapter 13 plans that come before the court for confirmation, the court routinely allows trustee's to orally advise the court as to deficiencies they have observed and express their support for plans by way of oral recommendations. When the trustee observes no issues with confirming a proposed chapter 13 plan, the trustee voices the same by way of a recommendation of the plan. When the trustee declines to recommend a plan for any reason but has not objected in writing, that is referred to herein as confirmation hesitancy. The court, of course, can confirm a plan even where the trustee demonstrates hesitancy. But as that hesitancy is usually grounded in the legal requirements for confirmation, the court considers closely instances where the trustee declines to recommend a plan. Counsel for debtors therefore often make accommodations to resolve a trustee's hesitancy, regardless of whether the proposed plan is confirmable in spite of that hesitancy.

same annual income are treated differently depending solely on when they receive the income."); *Morales*, 563 B.R. at 869.

Here the Debtor does not challenge, however, the propriety of the Tax Turnover commitment in general. He questions only whether the Tax Turnover commitment, in application in this case at this time, is fair to him.

DISCUSSION

The Debtor here argues that the Trustee's enforcement of the Tax Turnover commitment in this case has been inequitable. The Trustee has on two occasions prior to the Motion to Dismiss brought motions to dismiss predicated on the Debtor's failure to comply with the Tax Turnover commitment. As noted above, in each instance, the Trustee withdrew the motion to dismiss upon receiving the tax return, even though the return indicated a refund to the Debtor that would arguably have been due to the Trustee under the Tax Turnover commitment. Further, for two additional years the Trustee accepted the return alone even where the Tax Turnover commitment appeared to require refunds as well.

The Debtor therefore argues that he was lulled into believing that the Tax Turnover provision required tax returns only, not returns and refunds.[6]

The Debtor further argues that it is manifestly unfair for the Trustee to wait until the Debtor was at the end of the 60 months permitted by law for a plan to run to raise these issues, especially in light of the Trustee's earlier failures to act. The Debtor is on fixed, retirement income with a household that now totals five.[7] He is unable to obtain the funds to pay off the case within the 60 months and, were he required to pay the remainder at his present monthly Plan payment, the Plan would run an additional 90 months. Further, had he known earlier that the Tax Turnover provision applied as it does, he may have chosen to seek modification earlier or to allow the case to dismiss in favor of a later, more equitable one.

The Trustee, as she is entitled to do, says little about these inequities. She relies on the terms of the Plan and the Confirmation Order and asserts that the Debtor must correct the alleged underpayments or lose his chance at a discharge in this case. Her only explanation for her actions and inactions in the Debtor's case was that the Plan was mistakenly coded in her system.[8]

---

[6] The requirement that a debtor turn over her returns on an annual basis is grounded in the Bankruptcy Code itself. 11 U.S.C. § 521(f)(1). It is not uncommon for chapter 13 plans in the Northern District of Illinois or confirmation orders regarding the same to memorialize this commitment and is not uncommon for the return commitment to stand alone without a refund turnover requirement. The latter most often occurs when a debtor's monthly plan payments are sufficient to provide 100% to general unsecured creditors.

[7] The Debtor's household includes his wife, two children and one grandchild. In addition to the Debtor's retirement income, his wife contributes social security disability and part-time employment income to the household. Resp., at p. 1.

[8] That, of course, cannot be the entire story as it fails to explain why she sought dismissal based on the entirety of the Tax Turnover provision at the outset but later on part and then not at all.

8

The arguments raised by the Debtor are convincing, but only to a point. Both the Debtor and the Debtor's counsel should have been aware of the Tax Turnover provision and its express requirements. The absence of a Tax Turnover requirement in the Plan was an impediment to confirmation in this case, which was solved by the express inclusion of the provision in the Confirmation Order. That order is and has been of record in this case since March 2017.

Still, the Trustee's actions in regard to the Debtor's case cannot simply be ignored. Chapter 13 trustees exert enormous power over the administration of confirmed chapter 13 plans and the failure of the Trustee to act promptly with respect to her duties has been argued to this court before. While the Trustee tends to be unforgiving of errors by debtors' counsel, she nonetheless acts with a degree of impunity regarding her own missteps. Her actions in withdrawing motions seeking to enforce the Tax Turnover provision and then not pursuing it in subsequent years would unquestionably cause even a cautious person to question the application and contents of the requirement.

The essence of the Debtor's argument in the Response is therefore that he is entitled to an equitable defense to the enforcement of the Tax Turnover condition, namely *laches*. But *laches* is a defense applicable against a party who has slept on her rights. *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002) ("The doctrine of laches is derived from the maxim that those who sleep on their rights, lose them."). Here there is little question that the Trustee mis-administered this case, but the rights in question are not those of the Trustee. The rights in question are those that exist under the Bankruptcy Code, the Plan and the Confirmation Order. The Trustee isn't a party to the case in the normal sense. In other words, it is not the Trustee's rights, but the Trustee's responsibilities, that were slept on here. Further, the Trustee argues that the Plan would remain in default even if her Motion to Dismiss were denied. The application of *laches* to the Trustee is, therefore, problematic, at best.

By the same token, the Debtor's arguments in the Motion to Modify are equally problematic. First, the timing of the Motion to Dismiss necessitated that the Motion to Modify be brought on the eve of the Plan's 60th month. The law regarding modifications of chapter 13 plans after the 60th month is, at best, mixed. Further, what can or cannot be accomplished by way of a plan modification is an area of bankruptcy law best left undisturbed.

There is, however, a third possibility that leads to the outcome desired by the Debtor here. As stated above, the Debtor has asserted an equitable defense to the enforcement of the Tax Turnover provision.

Section 105 of the Bankruptcy Code allows the court to employ equitable remedies to carry out the goals of the Bankruptcy Code. While the Seventh Circuit has cautioned courts to use section 105 sparingly, the facts of this case warrant equity and are exactly the rare circumstance that Congress would have anticipated section 105 to be used for.

Rule 60 also presents an equitable avenue to relief from the Confirmation Order, where the Tax Turnover provision resides.[9] As will be discussed below, Rule 60(b)(5) expressly contemplates whether relief from a court order would be appropriate because prospective enforcement is no

---

[9]   The Federal Rules of Civil Procedure (as to each, "Rule ___") are made applicable in this proceeding under Rule 9024 of the Federal Rules of Bankruptcy Procedure.

longer equitable, the exact argument that the Debtor presents in both the Response and the Motion to Modify.

The court will take up each issue, in turn.

A.     *Laches*

One of the most compelling arguments made by the Debtor in the Response is that the doctrine of *laches* should prevent the Trustee from, at the eleventh hour, attempting to enforce a requirement that the Trustee had failed to act on earlier.

"'Laches,' the corruption of an Old French word (*lasche*) meaning 'lax,' in law means culpable delay in suing.  Traditionally, suits in equity were not subject to statutes of limitations, but such a suit could be dismissed on the basis of unreasonable, prejudicial delay by the plaintiff." *Teamsters & Emp'r Welfare Tr. of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 880 (7th Cir. 2002) (*citing Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925, 938–39 (7th Cir. 1984)).

As the Seventh Circuit has stated,

> [t]he defense of laches bars an action when the plaintiff's delay in filing the claim (1) is unreasonable and inexcusable, and (2) materially prejudices the defendant. *Jeffries v. Chicago Transit Authority,* 770 F.2d 676, 679 (7th Cir.1985); *Cook v. City of Chicago,* 192 F.3d 693, 695 (defining laches as "an unreasonable delay in pressing one's rights that prejudices the defendant").  Essentially the equitable substitute for a statute of limitations, laches serves to protect defendants from prejudice caused by stale evidence, prolonged uncertainty about legal rights and status, and unlimited exposure to liability damages. *See Cook,* 192 F.3d at 696.

*Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003).

Here, there is little question that the Trustee slept on the issue of the Tax Turnover's requirement to turn over refunds. *Chattanoga Mfg.*, 301 F.3d at 792.  As noted, there has been little or nothing offered by the Trustee to explain what transpired.  Rather than focus on the oversights, the Trustee argues in the Reply that she was diligent in bringing this matter to the court upon discovering it in the final audit of the case.  In a vacuum, that is true.  Taken in light of the history of the case, however, it is not.  What the Trustee ignores is that for this issue to have made it to that late stage of the case, she had to overlook the requirements of the Tax Turnover provision for multiple successive years.  That she asked for the refunds in the First Motion to Dismiss shows that she was aware of the requirement.  Her oversight in waiting to enforce it until the end of the Plan was both unreasonable and inexcusable, and the first factor of *laches* is met.

To be clear, the court is sympathetic to the demands placed on the Trustee as noted in the Reply.  In such a high-volume jurisdiction, the demands on the Trustee are high.  But rather than admit that she has made a mistake and leave it to the court to determine the appropriate outcome, the Trustee's filings appear to deemphasize her error and to seek, rather than an equitable solution, to block the Debtor from any outcome that might balance the parties' respective culpability.  Trustees in such circumstances would be mindful to remember that their jobs are not to act as goalkeepers, finding as many ways as is possible to prevent debtors from obtaining bankruptcy relief,

10

but rather to dispassionately enforce the requirements of each debtor's case and leave it to the court to decide what is fair.

As to the second requirement of *laches*, that the delay materially prejudices the Debtor, the outcome is not as clear. As the Trustee correctly points out, any prejudice to the Debtor arises first and foremost out of the Debtor's neglect of the Tax Turnover provision.

Here, both the Debtor and the Debtor's counsel bear some responsibility, the counsel more than the client. The Debtor is ultimately the one held responsible for both his and his counsel's actions and inactions. *United States v. 7108 W. Grand Ave., Chicago, Ill.*, 15 F.3d 632, 634 (7th Cir. 1994) ("The clients are principals, the attorney is an agent, and under the law of agency the principal is bound by his chosen agent's deeds. So much is clear for an attorney's willful misconduct. It is equally clear for negligent errors.") (citations omitted). Still, the court understands and is sympathetic too to the Debtor's claim that he was misled into thinking the Tax Turnover provision related to only returns given the Trustee's actions and inaction.

The court has less sympathy for the Debtor's counsel. The Debtor's counsel is in a better position to understand and urge compliance with the Plan's requirements than the Debtor, a layperson, is himself. Especially given the Debtor's counsel's extensive experience in chapter 13 matters, counsel should not have made the mistake that was made here and, knowing that the Plan neared completion, had an obligation to consider whether any impediments to completion existed and proactively address the same. Though there is no clear evidence that counsel neglected his duties here, all too often the court is faced with motions to dismiss at the end of chapter 13 cases that diligent counsel and responsive debtors could have staved off. The oversight that led to a failure to safeguard his client's interest is something the Debtor's counsel can and should address.

All of this considered, it is nonetheless the court's determination that the second element of *laches* is met. The fact that the Trustee ignored an essential aspect of the Tax Turnover requirement during the life of the Plan, only to act on the eve of the competition of the Debtor's Plan, is a major factor affecting the outcome here. It is too late now for the Debtor to address the omission. Continued payment on the Debtor's fixed income is the only option, but that would cause the Plan to run an additional 90 months—an extension that in and of itself exceeds the maximum statutory length allowable for chapter 13 plans. The Debtor has committed to and made payments to his Plan for five years out of income that, but for his voluntary commitment, would be exempt from the process. He now cannot solve the conundrum he faces. Whether it be the Trustee's rights or the Trustee's responsibilities that were slept on, the Trustee is at least partly responsible for the current situation that has materially prejudiced the Debtor and that is what the second element of *laches* requires.

*Laches* does have limitations. For example, the application of *laches* to the government is problematic. *See, e.g.*, *United States v. Admin. Enterprises, Inc.*, 46 F.3d 670, 672 (7th Cir. 1995) (while leaving the question undecided, noting that "[t]here is no dearth of statements that laches cannot be used against the government …."). The Trustee is a private trustee, however, and not a governmental employee. *United States v. Van den Bosch*, 798 F.2d 1417 (6th Cir. 1986) ("There is no question that [the chapter 13 trustee] was a private trustee and not an employee[] of the government."). While chapter 13 trustees do perform in a quasi-governmental role when acting in the United States Trustee's Office in chapter 13 cases, *see, e.g.*, 11 U.S.C. § 341(a) (where the United States Trustee who is designated to conduct meetings thereunder, not trustees generally), the

11

majority of what chapter 13 trustees do is to fulfill an administrative role within chapter 13 cases. That is not a governmental function, but a statutory one and one subject to the oversight of the court, first and foremost.[10] Thus, both because chapter 13 trustees are not government actors and because the actions of chapter 13 trustees are subject to the oversight of the court, it follows that chapter 13 trustees may be subjected to *laches* defenses. No party has argued otherwise.

Of greater concern is the Trustee's argument that, even should the court apply *laches* here, the Trustee will not permit the Plan to reach full administration because of her belief that the Plan remains incomplete.[11] In other words, the legal status of the Plan hangs in the balance regardless.

The court agrees with the Trustee on this point, insofar as it states that defeating a motion to dismiss on equitable defenses does not, in and of itself, do anything to change the grounds upon which the motion was based. Thus, even though *laches* applies and the Motion to Dismiss will be denied as a result, the court must look further.

B.    <u>Modification</u>

The issue regarding modification of the Debtor's Plan is a nuanced one. A modification such as sought here—a plan performance forgiveness—is routine and common should the conditions be met. The court easily considers a number of such requests every week. At the end of case, however, such requests face burdens.

Modification of a previously confirmed chapter 13 plan is governed first and foremost by section 1329 of the Bankruptcy Code, which states, in pertinent part, that

(a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—

(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;

(2) extend or reduce the time for such payments;

(3) alter the amount of the distribution to a creditor whose claim is provided for by the plan …; or

---

[10]    *Marbury v. Madison*, 5 U.S. 137, 167 (1803). Trustees, as with all other parties, are bound by the court's determination of what the law requires and whether those requirements are satisfied. *Id.* For example, it is the court, not the trustee, that determines whether the requirements for a discharge have been met. 11 U.S.C. § 1328(a).

[11]    There is an implication, no doubt unintended, in the Trustee's Reply that she remains the final arbiter of whether the Plan is fully administered. That, of course, is not the case. While the Trustee has what statutory duties she is afforded, should this court in denying the Motion to Dismiss rule on the state of the law in relation to the Plan, the Trustee would be obligated to follow that ruling or face the consequences.

12

> (4) reduce amounts to be paid under the plan by the actual amount expended
> by the debtor to purchase health insurance … .

11 U.S.C. § 1329(a).

The Seventh Circuit has observed that section 1329(a) modifications are not subject to any preconditions other than those expressly stated therein. *In re Witkowski*, 16 F.3d 739, 748 (7th Cir. 1994) ("By its terms, § 1329 does not provide for any threshold requirement to modify a bankruptcy plan. Rather, according to the terms of § 1329, the debtor, the trustee or an unsecured claimholder has an absolute right to request modification of the plan between confirmation of the plan and completion of the plan payments.") (citations omitted).

Section 1329(a) places therefore only two express preconditions on a modification thereunder, that (1) the modification be sought after confirmation of the plan but before the completion of payments under such plan and (2) the modification be upon request of the debtor, the trustee, or the holder of an allowed unsecured claim.

Here both conditions are met. The Motion to Modify was brought prior to the completion of the payments and the Motion to Modify is brought by the Debtor. As such, these conditions do not constrain the Motion to Modify.

There are, however, limitations in play. The court will consider each in turn.

1.       *Term*

It is black letter law that a modification proposed under section 1329(a) cannot contain a plan term that extends beyond 60 months. 11 U.S.C. § 1329(c). This is in keeping with the Bankruptcy Code's initial requirement that a bankruptcy plan as originally proposed cannot present a term longer than 60 months. 11 U.S.C. §§ 1322(d)(1) & (2); *In re Grant*, 428 B.R. 504, 508 (Bankr. N.D. Ill. 2010) ("§ 1322(d) limits Chapter 13 plans to a maximum of five years").[12] "Congress' intent in limiting the time span of a Chapter 13 plan was to protect debtors from a form of involuntary servitude." *In re Henry*, 368 B.R. 696, 701 (N.D. Ill. 2007).

The 60-month limitation is one that has, unfortunately, spawned a number derivative court-made policies that have confused the issue at bar here today.

First, despite it being the basis of a number of motions to dismiss from chapter 13 trustees, that a plan is running or may run longer than 60 months is *not* grounds for dismissal of a chapter 13 case. This practice is simply misplaced. The 60-month requirement is in the Bankruptcy Code provisions regarding plan contents and modifications, not in the ones regarding dismissal of cases.

---

[12]      For these purposes the court need not consider the effect of the CARES Act of 2020 (as extended by the COVID–19 Bankruptcy Relief Extension Act) and its potential to extend the term of a plan to 84 months. *See* 11 U.S.C. § 1329(d)(2). Even if the triggering criteria were met and relief were possible prior to the present sunsetting of the provision on March 27, 2022, the modification would not be feasible as an additional 24 months is not enough time for the Debtor to pay the Total Due on the Debtor's current budget. *See supra*.

*Id.* ("Nothing in § 1307 requires such dismissal.  The sections for confirmation and modification are separate and distinct from § 1307, which governs conversion and dismissal.").

Despite the trustees' continued reliance on this theory, courts in this Circuit have not required dismissal when a plan runs longer than 60 months.  *See, e.g.*, *id.*; *In re Handy*, 557 B.R. 625, 628 (Bankr. N.D. Ill. 2016) (Cox, J.).  Judge Cox noted that the Seventh Circuit itself has implicitly approved of allowing payments beyond the 60th month of a confirmed plan when considering the propriety of a trustee motion to modify.  *Germeraad v. Powers*, 826 F.3d 962, 967–68 (7th Cir. 2016) (payments after 60 months could be permitted "to cure the defaults and consummate the plan." (*citing* Hon. W. Homer Drake, Jr., *et al.*, *Chapter 13 Practice and Procedure*, § 11:15 at 1131 (2d ed. 2015))).

Second, perhaps as a result of this practice of seeking dismissal after 60 months, debtors appear reluctant to request plan modifications after the 60th month of a confirmed plan.  The court has to assume this result from hesitancy that such modifications running afoul of the 60-month limitation in section 1329(d) will be denied.  The undersigned has on occasion expressed that same hesitation, but *Germeraad* demonstrates why that should not be the case.

In *Germeraad*, the trustee brought a motion to modify a plan in order to increase plan payments so as to account for a postpetition increase in income of the debtor.  *Id.* at 964.  By the time the Seventh Circuit heard the matter on appeal, 60 months had run under the confirmed plan and the debtor argued therefore that the motion was moot.  *Id.* at 967.  The Seventh Circuit disagreed, concluding that while an order reversing the denial of the modification and thus the modification would occur after the 60th month, the modification itself did not expressly change the plan's terms which otherwise required the plan to complete within 60 months.  *Id.* at 968.  The Circuit was unconcerned with the implication that the late modification would clearly result in a plan running long, so long as the plan term itself was unmodified to go beyond what section 1329(d) requires.  The Seventh Circuit suggested that the court could deal with the resulting overtime plan in a variety of ways, including allow the case to continue for the default to be cured.  *Id.*  It therefore reversed the plan modification's denial and allowed the lower courts to address the effects.  *Id.* at 976.

While *Germeraad* occurred in hard-to-duplicate procedural circumstances (where a motion was brought well within a plan's 60 months but an appeal was resolved outside of it), the general proposition taken by the court from it is more broad:  Even after the 60th month of a plan, a court may modify a plan—even if the resulting plan will result by definition in a plan longer than 60 months—so long as the court does not extend the plan term itself beyond 60 months.  *Id.* at 969 ("§ 1329(a) does not place any temporal limits on the bankruptcy court's power to approve a requested modification.").

The court therefore concludes that the Motion to Modify may be brought, heard and determined after the 60th month of the Plan.  The express preconditions in section 1329(a) are met and the modification sought, though it might require the Plan to run longer than 60 months, does not invalidate the request.

14

2.     *Scope*

Even if the preconditions are met, relief may still nonetheless not be granted unless the "three general limits on the bankruptcy court's power to approve the request" are met. *Id.* at 970. "First, modification is allowed only if it will modify the plan in one of the ways specified in § 1329(a)(1)–(4). Second, a modification must comport with the provisions of the Code listed in § 1329(b)(1). Finally, … a modification may not result in a plan providing for payments over a term that is longer than the period specified in § 1329(c), which in this case is five years." *Id.* at 970–71.

In making this statement, the Seventh Circuit noted that the final condition—the term of the plan—mirrors the earlier discussion. For the reasons stated above, it is satisfied so long as the modification itself does not expressly alter the plan term to one longer than 60 months, even if the effect of the modification is that a plan may run longer than 60 months. *Id.* at 968.

The leaves the former two, neither of which is challenged here. The first of the two is, however, more than problematic in these circumstances.

In making the preceding statements regarding the general limits of the bankruptcy court's power, the Seventh Circuit assumed that the list of amendments in sections 1329(a)(1)-(4) is exhaustive. *Id.* at 970. This is not the first time the Seventh Circuit has made such an observation. *See, e.g.*, *Witkowski*, 16 F.3d at 745 ("[M]odifications are only allowed in [the] limited circumstances" set forth in section 1329(a)). While neither case analyzes the language of section 1329(a) to support such a conclusion and such a limitation is not expressly stated in section 1329(a), it is at the very least implied by it.

Bankruptcy courts routinely grant modifications that forgive or defer defaults, modifications that do not appear to be expressly within sections 1329(a)(1)-(4). *See, e.g.*, *In re Scott*, Case No. 14B-81270, 2017 WL 3835801, at *1 (Bankr. N.D. Ill. Aug. 31, 2017) (Lynch, J.). *But see In re Young*, 370 B.R. 799, 803 (Bankr. E.D. Wis. 2007) ("Forgiveness of prior plan defaults is not among these allowable reasons for modification.").

As in *Young*, when faced with a challenge such as the one brought by the Trustee here, the court must step carefully. Here, the modification proposed by the Debtor—forgiving what the Debtor assumes to be a Plan provision—is not expressly one of enumerated items in sections 1329(a)(1)-(4) and the court cannot see how, even in the broadest sense, it could be interpreted to be one. Given the Seventh Circuit's statements in *Germeraad* and *Witkowski*, the court must conclude that the modification sought by the Debtor is not a permissible one.

As a result, plan modification is not a permissible way to solve the Debtor's dilemma.

C.     Section 105

While the court may not grant the modification sought by the Debtor under section 1329(a), the question remains whether there is any avenue for relief available to the Debtor here. The most obvious, though perhaps most uncertain, alternative is an appeal to the court's general authority under section 105 of the Bankruptcy Code.

15

Under section 105, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) is a broad grant of authority, but not one without limitations. *Cordova v. City of Chicago* (*In re Cordova*), 635 B.R. 321, 341 (Bankr. N.D. Ill. 2021) (Barnes, J.). "[T]his Circuit at least has generated repeated cautions to trial courts against reliance upon [section 105] unless there is a gap in statutory coverage." *Id.* at 344 (*citing Kovacs v. United States*, 614 F.3d 666, 674 (7th Cir. 2010)).

Still, the existence of section 105 stands a clear indication from Congress that it did not believe it had anticipated all circumstances that might arise in a bankruptcy case and that it therefore empowered the bankruptcy court to address such unanticipated items. *Accord In re Caesars Ent. Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015). It also stands to reinforce the bankruptcy court's inherent authority over the cases before it and its own orders, especially when faced with inequitable conduct. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 383 (2007) (Alito, J., *et al.*, dissenting) ("Bankruptcy courts have used their statutory and equitable authority to craft various remedies for a range of bad faith conduct") (footnote omitted); *In re Direct Media Power, Inc.*, 582 B.R. 739, 750 (Bankr. N.D. Ill. 2018) (Barnes, J.), *aff'd,* Case No. 18 C 7397, 2019 WL 4601736 (N.D. Ill. Sept. 23, 2019).

The Seventh Circuit has stated, in the context of sanctions, that a "court should ordinarily rely on available authority conferred by statutes and procedural rules, rather than its inherent power, if the available sources of authority would be adequate to serve the court's purposes." *In re Rimsat, Ltd.*, 212 F.3d 1039, 1048–49 (7th Cir. 2000) (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041, 1058–59 (7th Cir. 1998)). That direction seems prudent in all circumstances, not just in the context of sanctions.

Here though, Congress has addressed plan amendments in section 1329 of the Bankruptcy Code and, as discussed above, the Seventh Circuit has interpreted the list of modifications set forth there to be exhaustive. Though the result is clearly a gap in statutory coverage for circumstances such as these, if the Debtor were actually seeking a Plan modification here, the court would be hard-pressed to use section 105.

There are, however, two reasons why section 105 might still apply. The first is that the relief sought by the Debtor here is not in actuality a modification, but a remedy. The second is that Tax Turnover provision is not part of the Plan itself, but the confirmation order.

As to the first, it bears repeating that a chapter 13 plan is a contract between a debtor and her creditors, enforced through the mechanisms of the Bankruptcy Code. *In re Harvey*, 213 F.3d 318, 320 (7th Cir. 2000) ("[B]ankruptcy plans are to be treated as contracts and interpreted under state law ... ."); *In re Kimball Hill, Inc.*, 620 B.R. 894, 902 (Bankr. N.D. Ill. 2020) (Barnes, J.); *see also Miller v. United States* (*In re Miller*), 253 B.R. 455, 458 (Bankr. N.D. Cal. 2000), *aff'd*, 284 B.R. 121 (N.D. Cal. 2002) (court should apply state law where the bankruptcy plan is confirmed).

Under Illinois law, courts do not generally modify contracts. They interpret and apply their terms and/or impose remedies. *See generally* T.F. Kelly, *Damages, Equity, and Restitution – Illinois Remedial Options*, 24 DePaul L.R. 274 (1975). Considering this, the Seventh Circuit's narrow interpretation of section 1329 becomes more palatable. While the circumstances in which a bankruptcy court might actually modify the terms of a plan are finite, the remedies that a court might apply to the contract under state law under section 105(a) are unaffected thereby.

As noted earlier, at least one court in the Seventh Circuit has declined to forgive a default as forgiveness is not one of the modifications set forth in section 1329(a). *Young*, 370 B.R. at 803 ("Forgiveness of prior plan defaults is not among these allowable reasons for modification."). Forgiveness, however, is not a modification, but a remedy akin to waiver. *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 829–30 (7th Cir. 2020) (discussing in detail waiver of defaults under Illinois law). Thus, when a bankruptcy court forgives a default under a chapter 13 plan, it is applying an equitable remedy under section 105(a). *Accord id.* at 829 ("Waiver excuses, not erases, an admitted breach by the legal, not metaphysical, effect of defeating a remedy for it.").

As a result, forgiving a default is not a modification and is not subject to the previously discussed concerns regarding the term and the scope of the same. Forgiveness has been applied by the local courts sparingly, with the preferred remedy being deferral of the default to be performed at the end of the plan. In keeping with equitable remedies, forgiveness applies only when the equities dictate it.

Forgiveness is what the Debtor requests here and the Debtor has demonstrated a set of circumstances unique to this case that equitably demands it. As a result, the court will exercise its authority under section 105(a) to forgive the Debtor's nonperformance of the Tax Turnover provision.

D.      Rule 60(b)(5)

When, as noted earlier, a court relies on section 105(a) as it does here, the result is uncomfortable at best. For that reason, it is appropriate to note that the same result as is sought here is available through other means.

The Tax Turnover provision places a duty on the Debtor that stems from a debtor's general duties in bankruptcy themselves, not from the requirements of chapter 13 plans. *See* 11 U.S.C. § 521(f)(1). It also places additional duties on the Debtor in order to resolve the Trustee's confirmation hesitancy.

Both the Debtor and the Trustee have missed in the briefing, however, that the Tax Turnover provision is a requirement in the Confirmation Order, not the Plan itself. Nothing in the Tax Turnover provision states or implies that it has the effect of a Plan modification. There are no Plan sections referenced or changed and the provision itself is drafted as a stand-alone requirement.

If it is a Plan modification, the court's ruling under section 105(a) remedies its performance. If it is not, a separate provision is available to afford the Debtor relief—Rule 60(b)(5). Rule 60(b)(5) states, in pertinent part, that

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion *and just terms*, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: ….
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; *or applying it prospectively is no longer equitable*; or

Fed. R. Civ. P. 60(b)(5) (emphasis added).

As drafted, Rule 60(b)(5) clearly invokes principles of fairness, referring to "just terms" and where "applying [the order] is no longer equitable." *Id.* To seek relief under Rule 60(b)(5), a party must move for the same "within a reasonable time." Fed. R. Civ. P. 60(c)(1).

> "There is no hard and fast rule as to how much time is reasonable for the filing of a Rule 60(b)(6) motion; courts have found periods of as little as a few months unreasonable, and have found periods of as long as three years reasonable." *Sudeikis v. Chicago Transit Authority,* 774 F.2d 766, 769 (7th Cir. 1985). "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and [the consideration of] prejudice [if any] to other parties." *Ashford v. Steuart,* 657 F.2d 1053, 1055 (9th Cir. 1981).

*Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir. 1986).

Here, the court concludes that the Debtor acted in a reasonable time in seeking the relief in the Motion to Modify. The Motion to Dismiss was brought in October 2021. Briefing on the same proceeded in mid-November. Less than a month after the last filing on the Motion to Dismiss it became clear that the Debtor would need to separately address the presumed default under the Plan and the Debtor brought the Motion to Modify. By any account, this was within a reasonable time.

What constitutes "just terms" for relief from a judgment has received little attention, but those courts that have addressed it have focused on the court's discretion to craft equitable remedies. *See, e.g.*, *Conerly v. Flower*, 410 F.2d 941, 944 (8th Cir. 1969) (discussing same); *see also Bennett v. Circus U.S.A.*, 108 F.R.D. 142, 150 (N.D. Ind. 1985) (requiring the posting of a bond against potential judgment as "just terms" for vacating a default judgment).

Here the question of just terms would be whether anything less than forgiveness of the Tax Turnover provision would be just. The court holds it would not. As noted earlier, the Debtor has devoted income to the Plan that he, by law, need not have contributed. He has performed all but the refund portion of the Tax Turnover provision for the length of the plan and has, but for the Tax Turnover provision, performed all of his obligations for five years. To require a Debtor on limited, retirement income to continue performance beyond 60 months would be unjust.

For the same reasons, the court holds that applying the Tax Turnover provision prospectively so as to deny the Debtor completion of the Plan is no longer equitable. *See, e.g.*, *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992) (discussing in the context of consent decrees that Rule 60(b)(5) requires more than inconvenience but a significant change); *see also Bell v. Eastman Kodak Co.*, 214 F.3d 798, 801 (7th Cir. 2000) (canvassing Rule 60 grounds and noting that Rule 60(b)(5) requires changed circumstances).

Here, continued performance under the Plan to address the default asserted by the Trustee is not just a mere inconvenience, but impossible. Were the court to allow the Plan to continue to run for the alleged default to be cured, the Plan would run an additional 90 months—more than the original term of the Plan and for an extended period that, in and of itself, exceeds the maximum length of allowed chapter 13 plans by an unreasonable amount of time. *See Germeraad*, 826 F.3d at 968 (noting that courts have allowed modification of plans beyond 60 months when debtors need a reasonable time to do so). The passage of time has rendered this Plan default insoluble. That is a

18

significant change that can be addressed now only through dismissal of the Debtor's Plan and case or through forgiveness of the Tax Turnover provision. As dismissal is inequitable and forgiveness is not, the court must conclude that the requirements of Rule 60(b)(5) have been met.

The forgiveness sought by the Debtor here is available both under section 105(a) and under Rule 60(b)(5). For these reasons, the Motion to Modify will be granted in that respect.

CONCLUSION

Based on the foregoing, the court finds that the Motion to Dismiss is barred by the doctrine of *laches* and that the Motion to Modify is appropriate, both under section 105(a) of the Bankruptcy Code and under Rule 60(b)(5). The Debtor's failure to perform the Tax Turnover provision is forgiven.

The Motion to Dismiss will be, therefore, DENIED and the Motion to Modify will be, therefore, GRANTED in the manner set forth herein. A separate order to that effect will be entered concurrently herewith.

Dated: March 30, 2022                    ENTERED:

_____
Judge Timothy A. Barnes
United States Bankruptcy Court